UTICA STRUCTURAL STEEL, Inc., a corporation, Utica, New York, Plaintiff,

v.

The DONOVAN WIRE & IRON COMPANY, a corporation, 805 Chicago Street, Toledo, Ohio, Defendant.

Civ. No. 7119.

United States District Court
N. D. Ohio, W. D.
Sept. 30, 1955.

Shumaker, Loop & Kendrick, Toledo, Ohio, Bond, Schoeneck & King, Syracuse, N. Y., for plaintiff.

Earl F. Boxell, Harry Levison, Harry S. Bugbee, Toledo, Ohio, for defendant.

KLOEB, District Judge.

This is an action at law for breach of contract in which plaintiff seeks recovery for damages alleged to have been sustained because of repudiation of the contract by defendant.

The complaint was filed on December 3, 1953. An amended complaint was filed on October 11, 1954, and the answer to the amended complaint was filed on October 19, 1954. The case was tried to the Court on the question of liability only beginning April 21, 1955, and requiring eight days of trial time. The question of damages was reserved pending the outcome of the trial on the question of liability. Extensive briefs were thereafter filed by both parties.

The amended complaint alleges that plaintiff is a corporation organized and existing under the laws of the State of New York and is resident of that State; that defendant is a corporation organized under the laws of the State of Ohio and is resident of that State; that, on July 23, July 27 and August 1, 1951, plaintiff, as a prime contractor, entered into three separate agreements with the United States of America, Corps of Engineers, United States Army, for the fabrication, according to specifications, drawings and requirements set out in the agreements and for the delivery to the transportation officer at Marion, Ohio, of certain Bailey bridges, and component parts thereof, including M-2 transoms, during a period commencing on or about December 1, 1951, and ending December 31, 1952; that, in October of 1951, plaintiff and defendant entered into an agreement evidenced by letters and purchase orders whereby defendant, as a subcontractor, agreed to fabricate, process and deliver 14,427 M-2 transoms at a price of $70.50 each, or a total price of $1,017,103.50, according to the specifications, drawings and requirements described in the prime contracts; that plaintiff, in reliance upon said agreement with defendant, proceeded to prepare for and carry out its agreements with the United States of America but that,

on December 4, 1951, defendant breached and repudiated its agreement with plaintiff and refused to fabricate the M–2 transoms in accordance with its agreement; that, as a result of such breach by defendant, plaintiff, in order to meet the urgent demands and requirements of its agreements with the United States of America, was compelled to undertake to provide necessary facilities to fabricate and to itself fabricate, process and deliver the said 14,427 M–2 transoms and it did provide facilities and complete the fabrication and delivery thereof at a cost to plaintiff of $95.70 each; that plaintiff duly performed everything required by it to be done under its agreement with defendant, but that as a direct consequence of the breach and repudiation of the contract by defendant it sustained certain damages.

Defendant, in its answer, sets up and relies upon three defenses, to wit, (1) no valid contract resulted from the exchange of correspondence and purchase orders in the month of October, 1951; (2) Martin L. Watson was not the agent of defendant in negotiating the alleged contract; (3) there was an excusable mistake in computing the offer of $70.-50 per transom justifying defendant's repudiation of the contract.

It appears that Albert D. Flint, an Industrial Engineer by profession, was in the employ of plaintiff in the years 1943, 1944 and 1945, and that, from February of 1951 to March of 1952, he served as a Vice President of plaintiff in charge principally of procuring work from the United States Government and particularly the United States Army: that, during his employment in the World War years of 1943, 1944 and 1945, plaintiff had supplied the Government with Bailey bridges and, early in 1951, Mr. Flint, assisted by a Mr. John Bash of Pittsburgh, Pennsylvania, who had been a procurement officer with the United States Army during the World War, and who was practicing as an Attorney in Pittsburgh, combined their efforts and secured the three prime contracts referred to in the amended complaint for plaintiff company. Thereafter, Mr. Flint exerted his efforts toward subcontracting some of the thirty-five component parts of the Bailey bridge and, in pursuit of his efforts, he came in contact with Martin L. Watson whom he had theretofore known.

Martin L. Watson was, in 1951, the General Manager of The Donovan Steel Pickling Company, located in Toledo, Ohio, adjacent to the premises of defendant, The Donovan Wire and Iron Company. The offices of both of these companies were located in the same building, defendant's offices being on the ground floor and the offices of the Pickling company being on the second floor. Mr. Charles Fruchtman was President of defendant company. Mr. Irwin Fruchtman, Mr. Leonard Fruchtman and Mr. Chester Devenow were Vice Presidents of defendant and these four gentlemen comprised the Board of Directors of defendant. The Executive Committee which passed on all major commitments was comprised of the three Vice Presidents of defendant. Mr. Chester Devenow was President of The Donovan Steel Pickling Company, Mr. Leonard Fruchtman was Vice President, and Mr. Irwin Fruchtman was Secretary and Treasurer of this company. These three gentlemen were also on the Board of Directors of the Pickling company. When Mr. Watson was not fully engaged with his duties as Manager of the Pickling company he worked on his own as a broker in steel on a commission basis. He had formerly been employed by the Copco Company and, during this employment, had had some experience with contracts involving the fabrication and processing of Riband guard rails and J-bolts which were component parts of Bailey bridges.

Mr. Watson invited Mr. Flint and Mr. Bash to come to Toledo to the offices of defendant company to see if it would be possible to subcontract one or more of the component parts of the Bailey bridge. On September 7, Mr. Flint and

Mr. Bash arrived in Toledo and were ushered by Mr. Watson into the offices of the defendant company, where arrangements had been made for the visitors to meet its three Vice Presidents. According to the testimony of Irwin Fruchtman, concurred in by Mr. Flint, Mr. Watson introduced Mr. Flint and Mr. Bash to the three Vice Presidents by saying "These are my bosses". Mr. Flint spread the plans and specifications relative to the thirty-five component parts of the Bailey bridge on the table before the gentlemen and discussed the various parts that defendant would be most likely to be interested in. Mr. Flint is of the opinion that, in addition to the specifications (P. Exs. 3 and 4), he exhibited the overseas packaging plans for the M–2 transoms (P. Exs. 5, 6, 7), the engineering drawing D–2674–2 entitled "Widened Roadway Portable Panel Bridge M–2 (Bailey type) Miscellaneous Details" (P. Ex. 8; D. Ex. 1), and that he exhibited and discussed drawings D–2508–1–2–3–4–5 (D. Exs. 17, 18, 19, 20, 21), all of which contained in detail the drawings of the component parts of the bridge. Drawing D–2508–4 (D. Ex. 20) contained a drawing in the upper left hand corner of an 18′ transom detail that had not been in use by the Army since it had widened the Bailey bridges to a 19′ 11″ transom some six years before. The latter transom was shown on D–2674–2 (P. Ex. 8; D. Ex. 1).

It appears that Mr. Watson expressed a special interest in a subcontract to fabricate the Riband guard rails and the J–bolts. Defendant's officers said that they would have their engineers make a study and if they felt that they could do anything they would be glad to get in touch with Mr. Flint.

At the conclusion of the conference, Mr. Flint gathered up what he believed to be all of the drawings and specifications and gave them to Mr. Watson. Mr. Watson, Mr. Flint and Mr. Bash then went on a tour of the premises of defendant company in order to give Mr. Flint some idea of the capacity and capabilities of defendant to assume a fabrication contract. At the conclusion of the inspection Mr. Flint suggested to Mr. Watson that he thought that they could do the transoms.

We cannot conclude, from a consideration of all of the testimony concerning this meeting that there was any pressure or coercion exerted by Mr. Flint on the officers of defendant company or that he "requested" that they do the transoms.

On September 19, defendant, through its officers, contacted Mr. Alfred M. Samborn, of the engineering firm of Samborn, Steketee & Associates of Toledo, and asked him to come to their offices for consultation. Mr. Watson was asked to bring in the plans and specifications that had been left by Mr. Flint, and Mr. Samborn was employed to study these plans and specifications with a view to arriving at a price per transom to be submitted to plaintiff and, in addition, to survey the facilities of defendant and determine what the probable cost would be to place it in a position to fabricate 14,427 transoms. Mr. Samborn took the plans and specifications back to his office and the following day, September 20, reported to defendant, in person, and quoted a price of approximately $72 per transom.

On October 2, after a consultation with one or more of the officers of defendant and with Mr. Samborn, Mr. Watson went to Utica, New York, where he met Mr. Flint and Mr. Carl Blim, the President of plaintiff company, in the latter's office on October 3.

After some thirty minutes of discussion, Mr. Blim took Mr. Watson to the office of Mr. John Saponaro, Vice President and Chief Engineer of plaintiff company, where, with Mr. Paul Schwerdt, Plant Superintendent of plaintiff company, Mr. Watson spent approximately two hours in going over the plans and drawings and methods of fabrication in connection with the transom. He then reported back to Mr. Blim and stated that he was ready to make an offer on the transoms. He quoted a price of approximately $72 per transom and, upon being told that he was a little too high and that the contract might be had at a price

of $70.50 per transom, he went to a telephone ostensibly for the purpose of calling his superiors in Toledo. He returned from the telephone and orally agreed on the price of $70.50 per transom, subject to later written confirmation.

On October 5, Mr. Watson, on the letterhead of the defendant company wrote to Mr. Blim as follows:

"Confirming writer's verbal quotation while in your office Wednesday, October 3rd, we wish to quote as follows:

"14427 pcs. Bailey Bridge Transoms as per prints and specifications furnished by you, $70.50 each F.O. B. Marion, Ohio

"It is our understanding that all steel for the entire order has been placed from your office, delivery beginning January through June, 1952.

"Trusting this will meet with your approval and we will be favored with the order at once so that we may get our plan completed as quickly as possible.

"Very truly yours,

"Donovan Wire & Iron Company
"(signed) M. L. Watson
"MLW/jb M. L. Watson" (P. Ex. 15).

On October 11, Mr. Blim replied as follows:

"Mr. M. L. Watson
"The Donovan Wire & Iron
 Company
"Toledo 11, Ohio
 "Re: Bailey Bridge Transoms
"Dear Mr. Watson:

"We acknowledge your quotation of October 5 in confirmation of your verbal quotation covering Bailey Bridge Transoms at $70.50 each, f.o.b. Marion, Ohio.

"It is our intention to place this order with your company. However, as per our conversation while your Mr. Watson visited our office, we are taking the matter up of substituting pickling of the material instead of sand blasting.

"We have asked the Army Engineers for this acceptance just as promptly as possible and upon receipt of same will mail you our formal orders.

"Very truly yours,
 "Utica Structural Steel, Inc.
 "(signed) Carl Blim
"CB/ac Carl Blim, President"
 (P. Ex. 17).

Under date of October 22, Mr. Blim addressed three letters (P. Exs. 20, 21, 22) to The Donovan Wire and Iron Company, Toledo 11, Ohio, Attention Mr. M. L. Watson, and with each of these letters he enclosed a purchase order calling for a total of 14,427 transom M-2 beams for Bailey bridges.

Numerous telephone calls were exchanged thereafter and a number of letters were written by Utica to defendant. On November 14, Mr. E. S. Lewis, who was Director of Purchases for the defendant company, wrote plaintiff a letter (P. Ex. 72) concerning certain steel bars on order with the Youngstown Sheet & Tube Co., and suggested "This change is suggested by our engineer because of the way we intend to machine the small block which is welded to the fillet of the beam."

On November 26, Mr. Samborn and Mr. Lewis visited the offices of plaintiff in Utica and spent about two hours with Mr. Saponaro and Mr. Schwerdt in their offices and out in the plant in an apparent attempt to gather all the "know how" in connection with the fabrication of the transoms, particularly from Mr. Schwerdt who had had considerable experience with this kind of work during the World War. After the return of Mr. Samborn to Toledo, he made a report of his trip (P. Ex. 84) to defendant and in this report he devotes his time to a discussion of the hours required in the various steps to be taken in the fabrication of the transoms. On page 3, he concludes as follows:

"Our recommendation is that we test the welding time on a hand model to see if we can approach production of one beam per hour for two men and that we once again check on local labor costs."

On November 27, the day after this meeting, Mr. Saponaro wrote an office memorandum to Eleanor Centola, who was Assistant to Mr. Blim in Purchasing and who had charge of allocation of priorities (P. Ex. 73), as follows:

"Nov. 27–51

"Eleanor

"After talking to Mr. Lewis— Monday Nov. 26—it was decided that the Bars can be 1½″ x 1″ as we originally ordered them. Our quantity is still right"

On December 4, 1951, Mr. E. S. Lewis, writing on behalf of defendant, directed the following letter to plaintiff:

"Utica Structural Steel, Inc.

"2104–6–8 Dwyer Avenue

"Utica 1, New York

"Attention: Mr. Carl Blim, President

"Gentlemen:

"We are returning herewith your Purchase Orders 08990, 08991 and 08992.

"As you know, these orders were issued against a quotation which was made from a drawing given to us in error. We have revised our original estimate based on the correct drawing, and are forwarding a new quotation covering the larger transom, under separate cover.

"Very truly yours,

"The Donovan Wire & Iron Co.

"(signed) E. S. Lewis

"E. S. Lewis,

"ESL/hm Director of Purchases

"encl." (P. Ex. 40).

Under date of December 21, Mr. Blim wrote as follows:

"The Donovan Wire & Iron Company

"Toledo 11, Ohio

"Attn: Mr. E. S. Lewis, Director of Purchases

"Re: Transom Beams M–2 "Bailey Bridges

"Gentlemen:

"We have your letter of December 4 returning our purchase orders 08990, 08991 and 08992, above subject.

"We are very sorry that if the quotation made by your company's representative, Mr. Watson, and confirmed by your company under date of October 5 in writing has been found to be in error, it does not excuse your company from the liability in full-filling the contract.

"We, therefore, are returning the orders and will expect that you fullfill the orders in accordance with the prices shown thereon.

"It will be appreciated if you will advise your acceptance of these orders by return mail.

"Very truly yours,

"Utica Structural Steel, Inc.

"(signed) Carl Blim

"CB/ac Carl Blim, President

"Encls. Orders 08990, 08991, 08992." (P. Ex. 41).

On January 22, 1952, Mr. Irwin Fruchtman, Vice President of defendant, wrote plaintiff as follows:

"Utica Structural Steel, Inc.

"2106 Dwyer Avenue

"Utica, New York

"Attention: Mr. Carl Blim, President

"Gentlemen:

"This letter will acknowledge receipt of your telegram received yesterday, authorizing cancellation of the orders we had placed with the Bethlehem Steel Corporation covering high tensile beams for the Bailey Bridge Transom.

"The local Bethlehem office has been notified that the transoms are to be manufactured at some other point, by some other party, and that

we will not require delivery of the steel.

"We regret the misunderstanding which made the steel cancellation necessary, and trust that Bethlehem will take care of your requirements through one of their other district offices.

"Very truly yours,
"The Donovan Wire & Iron Co.
"(signed) Irwin Fruchtman
"Irwin Fruchtman
"IF/hm Vice-President"
(P. Ex. 65).

Defendant refused to proceed with the fabrication of the transoms but did suggest that it would make an effort to secure some other concern to do the work. Nothing came of this and plaintiff then arranged for the work to be done under its own supervision.

In the foregoing, we have attempted to review the most important steps that were taken by the parties to this action beginning about September 7, 1951.

## Was a valid contract entered into between the parties?

■ We are of the opinion that a valid contract was entered into by the parties through the exchange of the letters and purchase orders, Plaintiff's Exhibit 15, being letter from defendant to plaintiff dated October 5, 1951, Plaintiff's Exhibit 17, being letter dated October 11, 1951 from plaintiff to defendant, and Plaintiff's Exhibits 20, 21 and 22, being letters dated October 22, 1951, each enclosing therewith a purchase order. These exhibits appear to contain the required elements of a contract necessary for a meeting of the minds. The case of Leonard v. Howard et al., 1913, 67 Or. 203, 135 P. 549, appears to be in point.

## Was Martin L. Watson the agent of defendant in the consummation of this contract?

■ We believe that he was.

We believe that he not only was represented by defendant to plaintiff as its agent, with full authority to pursue the course that he did, and that plaintiff placed implicit reliance upon these representations, but we believe further that Mr. Watson had been and was expressly authorized by defendant to act as its agent in the negotiation of the contract.

Defendant's officers authorized and permitted Mr. Watson to arrange for the meeting in defendant's offices between Mr. Flint and Mr. Bash, representing plaintiff, and the three Vice Presidents of defendant. Mr. Watson introduced plaintiff's representatives to "my bosses" and there is no dispute about that; the officers of defendant, along with Mr. Watson, consulted for an hour with plaintiff's representatives, over the plans and specifications, with the thought in mind of contracting to process one or more of the component parts of the bridge. At the conclusion of the conference, Mr. Irwin Fruchtman stated that the company was interested and that the specifications and drawings would be turned over to defendant's engineer for study and that, in due course, Mr. Flint would hear from them.

Thereafter, with the knowledge and consent of defendant's officers, Mr. Flint and Mr. Bash were taken on a tour of defendant's premises by Mr. Watson for the purpose of giving Mr. Flint an insight into the facilities and the capabilities of defendant to take on a contract.

In pursuance of their interest in a proposed contract, the officers of defendant sent for Mr. Samborn, a consulting engineer, and conferred with him in their offices with Mr. Watson on September 19, and, at the conclusion of that meeting, authorized Mr. Samborn to make a study and come up with some figures for the fabrication of the transoms. Again, on September 20, defendant's officers and Mr. Watson met in the offices of defendant with Mr. Samborn and received the figures that he had arrived at. Thereafter, Mr. Watson discussed his proposed trip to Utica with Mr. Devenow, Mr. Samborn and Mr. Irwin Fruchtman in the latter's office. There is some dispute as to whether Mr. Devenow was

present at this latter meeting and whether he knew that Mr. Watson was about to make the trip to Utica, but Mr. Watson, defendant's witness, in his deposition testified that he discussed his proposed trip not only with Mr. Samborn and Mr. Irwin Fruchtman but also with Mr. Devenow.

Mr. Watson went to Utica and met Mr. Blim and Mr. Flint on October 3, and spent an entire morning in studying the problem of processing the transoms with Mr. Saponaro and Mr. Schwerdt and then made a verbal offer.

After his return to Toledo, Mr. Watson wrote, on the stationery of defendant, a written offer (D. Ex. 15). At all times thereafter, and up to December 4, 1951, defendant proceeded on the premise that it had a contract. As late as November 26, defendant had its representatives Mr. Samborn and Mr. Lewis at the plant of plaintiff in Utica exploring the methods to be pursued in fabricating the transoms. As late as November 27, defendant's engineer Mr. Samborn dictated a written report to defendant's officers (P. Ex. 84), in which he went into a full discussion of the man hours that would be required in the fabrication process.

When defendant repudiated the contract on December 4 by way of a letter from Mr. E. S. Lewis, Director of Purchases, (P. Ex. 40), the ground of repudiation was not lack of authority in Mr. Watson to negotiate a contract but on the ground of a mistake in computing figures on the basis of a wrong drawing.

When Mr. Irwin Fruchtman wrote his letter of January 22, 1952 (P. Ex. 65), he expressed regret for the misunderstanding which made the steel cancellation necessary, but said nothing about lack of authority in Mr. Watson.

It appears to us that defendant fully ratified the acts of Mr. Watson in negotiating the contract for it; that not only did defendant authorize Mr. Watson's acts but ratified them thereafter; that plaintiff placed implicit reliance upon the acts of Mr. Watson as defendant's agent and upon his authority to so act; that Mr. Watson himself never was apprized by defendant that he had acted without authority or beyond his authority. Mr. Watson was ill in a hospital at the time of the trial and his deposition taken on December 30, 1953 was offered by defendant. In this deposition, taken more than two years after the occurrences in question, Mr. Watson testified as follows (Dep., p. 31):

"Q. Yes, November 7, the last letter that was marked to your attention. Evidently Mr. Lewis takes over the correspondence. A. I had no further correspondence at that time.

"Q. What happened, if anything, about this date, Mr. Watson, where apparently you no longer conducted the correspondence with respect to this matter with Utica, but Mr. Lewis took over? A. Mistake was discovered. Mr. Devenow told me to get out of it, have Mr. Lewis try and straighten up this mistake.

"Q. What mistake are you referring to? A. Mistake in the prints. We had figured one print and they had sent us orders for another print."

It seems, therefore, that up to more than two years after Watson had acted on behalf of defendant, he was ignorant of the fact that his authority to act as defendant's agent was to be questioned by his superiors. At the date of the taking of the deposition and up to the time of trial Mr. Watson was still in the employ of the Pickling company as its manager, with defendant's officers as his superiors.

There is nothing of record in the entire proceedings wherein the authority of Mr. Watson to act as agent for the defendant is questioned until after this action was begun. At no time, in writing, did defendant raise the question of Mr. Watson's authority. We believe that the protest comes too late, and that it appears to be more in the nature of an afterthought than a persuasive defense.

Was there an excusable mistake in computing the offer of $70.50 per transom justifying defendant's repudiation of the contract?

 We believe there was not. Certainly there was no mistake upon the part of Mr. Flint when, on September 7, he exhibited to defendant's officers and to Mr. Watson the D–2508 series of drawings numbered 1 to 5, both inclusive, and particularly D–2508–4 (P. Ex. 78; D. Ex. 20), over which there is considerable controversy. It was essential to exhibit and discuss these drawings because they contained the sketches of each of the component parts of a Bailey bridge. D–2508–4 contained drawings of at least seven component parts other than the transom itself, and included in these parts were drawings of the Riband guard rails and J–bolts in which Mr. Watson had expressed considerable interest. It appears to us that it would have been a mistake upon the part of Mr. Flint had he not exhibited and discussed the D–2508 series of drawings and especially D–2508–4. It is true that, in the upper left hand corner of the drawing D–2508–4, there appears a sketch of an 18′ transom that had been in disuse for at least six years and that had been superseded by the 19′ 11″ transom as shown in the drawing D–2674–2 (D. Ex. 1), but Mr. Flint, who appeared as defendant's witness by way of deposition, testified that he exhibited and discussed with defendant's officers at the meeting on September 7 D–2674–2 (D. Ex. 1). In his deposition at page 58 we find the following questions and answers:

"Q. Will you tell the reporter, please, whether Exhibit 27, (D–2674–2), or an exact duplicate of it, was among the drawings that you exhibited to Mr. Fruchtman and the other gentlemen in his office that day you were there? A. I would say that I did have this drawing or one like it.

"Q. And was it one of the drawings that were on the table there, or one like it? A. Yes, I would say it was.

"Q. And was that drawing in a general way looked at and discussed by Mr. Fruchtman and the other gentlemen present there? A. I have answered that question several times. There was no detailed discussion of any drawings or any—

"Q. (Interposing) I said 'general', was there a general discussion? A. I just simply said 'Here are the parts—' my idea was to see the print —'Here are the drawings. You take them and indicate to us what you are interested in.'

"Q. You understood my question. I did not ask if there was a detailed discussion, Mr. Flint; I asked you if there was in a general way— A. Very general, yes.

"Q. Of this one and the others like it that you had there? A. Just a general discussion of all drawings, what they were;".

Mr. Flint in his deposition appeared to be equally confident that he had left all the pertinent drawings and specifications at the conclusion of the conference, but he would not swear positively that all of the exhibits that he had with him and that he had discussed were left there. He was of the impression that all of them had been left.

Assuming that a mistake was made by Mr. Samborn in making a sketch of an 18′ transom and in computing his figures on the basis of an 18′ transom rather than a 19′ 11″ transom, we see no excusable mistake involved because there appears no intent or design upon the part of plaintiff to deceive or mislead or any mistake on the part of plaintiff calculated to deceive and that could be attributed as negligent conduct on its part.

The specifications, Plaintiff's Exhibits 3 and 4, were admittedly left with the defendant. On page 2 of Plaintiff's Exhibit 3 we find the following:

"A–2. Drawings.—The following drawings of the issue in effect on date of invitation for bids form a part of this specification.

"A–2a. Corps of Engineers Drawings, Nos.—

D–2508–2 to 5 inclusive.
Portable Panel Bridge (Bailey Type).

D–2674–1 and 2. Widened Roadway, Portable Panel Bridge M2 (Bailey Type).

"B. Type.

B–1. This specification covers only one type of widened roadway, Bailey type, panel bridge."

On page 8 of Plaintiff's Exhibit 3, we find the following under the subheading "Notes":

"H–2. Copies of this specification and other Government specifications and drawings listed in Section A may be obtained from the office issuing the invitation for bids, or from the Contracting Officer after the contract has been awarded. Agencies within the War Department may obtain copies of this specification from Army Service Forces, Office of the Chief of Engineers, Washington 25, D. C."

The specifications on page 1 bear the following dates:

"No. 47–91A
12 September 1945
Superseding No. 47–91
10 March 1945".

Plaintiff's Exhibit 4, being an amendment to Exhibit 3, is dated October 12, 1949, and refers also to "Bridge, Fixed, Steel, Panel, Bailey-Type, M2 (Widened Roadway)".

D–2508–4 (P. Ex. 78; D. Ex. 20), which is the drawing that Mr. Samborn alleges that he used as the basis for his drawings and calculations, is dated January 4, 1942.

The offer of defendant contained in its letter of October 5 (P. Ex. 15) is based upon "prints and specifications" and thereby makes the specifications a part of the contract. Let us quote a portion of this letter again:

"Confirming writer's verbal quotation while in your office Wednes-day, October 3rd, we wish to quote as follows

"14427 pcs. Bailey Bridge Transoms as per prints and specifications furnished by you, $70.50 each F. O.B. Marion, Ohio"

Assuming again that Mr. Samborn, the engineer, made a mistake in basing his figures upon an 18′ transom rather than a 19′ 11″ transom, which for more than six years and according to the specifications was a component part of the widened roadway Bailey bridge, we believe that it was a mistake that could not be attributed to any neglect of plaintiff but should be attributed to neglect of the defendant due, without doubt, to a hasty and superficial appraisal and examination of the prints and specifications.

There was no haste enjoined upon defendant by plaintiff in the examination of the prints and specifications and in computing figures for the basis of an offer. Mr. Flint had left the prints and specifications with defendant, after discussing them, on September 7. It was not until September 19 that Mr. Samborn was called in to defendant's offices and was there shown the drawings and specifications and given authority to compute his figures. He was back the following day with figures that entailed the making of a contract involving more than a million dollars. There was ample time thereafter for a reappraisal of the figures before an offer was made. It was not until October 3, when Mr. Watson, after further discussion with Mr. Samborn and with his superior officers, visited the plant of plaintiff in Utica at which time, after two hours of further inquiry upon the part of Mr. Watson of plaintiff's experts, he made an oral offer to Mr. Blim. The specifications had been left by Mr. Flint with the defendant about one month before the oral offer was made to plaintiff. There was ample time to have secured the necessary drawings called for by the specifications if the engineer did not already have them.

Plaintiff's Exhibits 5, 6 and 7, being the overseas packaging drawings, were

admittedly left with the defendant by Mr. Flint. These drawings were each entitled "Bridge, Fixed, Steel, Panel, Bailey-Type, M2 (Widened Roadway)", thus bearing the same title as did the specifications. According to these directions, eight transoms were to be packaged in one bundle and the total weight of one bundle is listed at 5046 pounds. Weight of a bundle was an important computation in arriving at the ultimate figure because it involved the question of freight charges. The weight of the 18′ transom was 443 pounds and a bundle of eight of these packaged together would weigh 3643 pounds. These figures the engineer clearly knew from the drawings that he admittedly had before him. Here was a difference in weight per bundle of 1402 pounds, a very vital question in computing the ultimate figure.

We believe that defendant should have known the length of the transom on which they were making an offer even from the time that Mr. Watson visited plaintiff's offices on October 3. Mr. Watson had spent many years with different steel companies in different capacities. Although not an engineer, he was familiar with steel. He had been with Copco when that company was engaged in processing some component parts of a Bailey bridge years before. He spent two hours on October 3 in the company of Mr. Saponaro and Mr. Schwerdt and during this time the entire conversation was centered on the transoms of the Bailey bridge on which Mr. Watson was about to make an offer to Mr. Blim.

It appears to us that defendant ought to have been sufficiently alerted through the activities of their agent to have been in position to intelligently figure and submit an offer.

We have had much difficulty during the trial of the case, in the study of the case and in arriving at our conclusion, over the recitation of numerous telephone calls that were exchanged between the parties. The events in question took place in September, October, November and December of 1951, substantially two years before the depositions of Martin L. Watson and Albert D. Flint were taken and substantially three and one-half years before the trial of this case. Witnesses have testified not only to the dates of telephone calls in connection with which no memoranda were made or retained but to the details that were discussed in these calls. We can well see how one's memory might be refreshed as to the time and subject of telephone calls made years before by notations that were made and kept following the calls. We can well see where the subject of telephone calls might well be reviewed by a witness when correspondence followed these calls and referred to them. However, we are skeptical in placing complete confidence in the review of telephone calls where memory alone is relied upon. We have analyzed, with complete confidence, the documentary evidence that has been submitted in this record and we have given credence to the recitation of telephone conversations that have been connected by correspondence. Where, however, the recitation of telephone conversations conflicts either with the documentary evidence or the conduct of the individuals as shown by the record we are inclined to doubt the accuracy of the telephone conversations.

We are discussing the subject of mistake. It is the testimony of Mr. Devenow and of Mr. Lewis that a mistake in figuring on the fabrication of an 18′ transom was discovered about the 9th day of November. Mr. Devenow testifies that he called Mr. Blim over the telephone on November 13 and not only notified him that Mr. Watson had acted on his own and not as an agent of defendant in negotiating the contract but that a mistake had been discovered in figuring the price. Yet, on November 14, we find a letter from defendant by Mr. Lewis (P. Ex. 72) addressed to plaintiff in which he discusses certain bars that were on order with the Youngstown Sheet and Tube Company and makes no mention whatever of a mistake having been discovered. On this date he was interested, not in the repudiation of the contract on the basis of

mistake, but in the fulfillment of the contract.

Although it is claimed that the mistake was discovered on or about the 9th day of November, yet on the 26th day of November we find Mr. Samborn and Mr. Lewis in the offices and the plant of plaintiff company actively acquiring all the "know how" that they could obtain from Mr. Saponaro and Mr. Schwerdt, and on the following day we find the written report of Mr. Samborn heretofore referred to (P. Ex. 84), in which he recites to his employers his conclusions on the man hours that would be required to fabricate the transoms in the performance of the contract, and we find the memorandum of Mr. Saponaro (P. Ex. 73) to Eleanor Centola in which the subject of discussion is the size of the bars. At no time in the documentary evidence do we discover any protest on the part of Mr. Samborn over any mistake that he may have made. The first written evidence that we have of the discovery of a mistake is the letter of December 4 by Mr. Lewis, in which he apprizes plaintiff that they are placing reliance on a mistake that had been made in quoting a price. Time was important in the fulfillment of the contract because delivery of the transoms was expected by the close of the year, or shortly thereafter, and yet, although defendant appeared to be bending its efforts in the performance of the contract, it was not too much concerned over a price that it had offered which it claims that it knew after November 9 was based upon a mistaken conception of the length of the transom.

If, due to an honest mistake and to a mistake made while in the exercise of ordinary care, the defendant had quoted a price that was so low as to excite the suspicion of a person skilled in the business that a mistake had been made, we might be presented with a more difficult problem. However, in June of 1951, in the preparation of figures for the submission of a bid to the Government for the prime contracts, the plaintiff made an estimate of the cost of fabricating transoms for the widened roadway. Plaintiff's Exhibit 75, which is the estimate of cost prepared by Mr. Saponaro, and which is the result of his study made in June of 1951, indicates that in making the bid for the prime contracts plaintiff estimated the cost of fabricating the transoms at $70. There was, therefore, nothing in the price of $70.50 quoted by defendant and accepted by plaintiff which might tend to excite the suspicion of plaintiff that a mistake had been made.

In the consideration of this question of mistake, we have studied and placed reliance upon the case of Leonard v. Howard et al., Supreme Court of Oregon, found in 135 P. at page 549. We have also relied upon the case of Bowser, Inc., v. Hamilton Glass Co., 207 F.2d 341, which is a decision by the United States Court of Appeals for the Seventh Circuit, decided October 9, 1953. Both of these cases were cited by plaintiff.

In analyzing the law on the question of mistake, defendant has devoted pages 37 to 51 of its brief in the citation and discussion of a large number of cases. In analyzing these cases, we find that all of them, with but one exception, are cases wherein the plaintiff is bringing a suit in equity for the rescission of a contract and where the Courts have concluded, from the facts, that rescission was in order because it was possible to restore the defendant to a position of statu quo without injury or damage to the defendant because of the mistake made by plaintiff in making its quotation. We do not here have an equity case in which the remedy of rescission is prayed for. We have a case at law in which damages are sought for the breach and repudiation of a contract, and in which it would not be possible to restore the parties to a position of statu quo. Plaintiff appears to have done everything within its power to carry out the terms of the contract. It has suffered injury because of the repudiation of the contract. We believe that it is entitled to an order adjudging that defendant vi-

olated the contract as pleaded in the amended complaint. The question of damages is a matter for another day.

Plaintiff may prepare and submit within ten days findings of fact and conclusions of law drawn in accordance with this opinion. Defendant may file its exceptions and suggested additions thereto within ten days thereafter.